## Davenport and Rock Island Bridge Railway and Terminal Company et al. v. Walter Johnson

### and

### Same v. Frederick Hass.

*Opinion filed December 20, 1900—Rehearing denied February 8, 1901.*

1. PLATS—*plat made by county commissioners under act of 1833 should be acknowledged by them.* Under section 4 of the act of 1833, providing that when county commissioners desire to lay out a town they shall have a survey and plat made, "which plat shall be certified by the county surveyor and the county commissioners," and when offered for record by "any person or persons whose duty it shall be to comply with the foregoing requisitions," shall be acknowledged, county commissioners are required to acknowledge such plats.

2. SAME—*when plat is not sufficiently acknowledged by county commissioners.* Acknowledgment of a plat by county commissioners before the clerk of the circuit court is not a sufficient compliance with the act of 1833, which requires such acknowledgment to be before a justice of the Supreme Court, justice of the circuit court or justice of the peace in the county where the land lies.

3. SAME—*plat does not have full effect as a conveyance unless the statute is followed.* In order that a plat made by county commissioners under the act of 1833 may have the effect of a conveyance to vest the fee simple of all the parcels of land therein described, the plat must be "made out and certified, acknowledged and recorded" as required by such act.

4. SAME—*plat not acknowledged does not convey fee of streets.* A plat made by the county commissioners under the act of 1833, which is not acknowledged by them, does not convey the fee of the streets marked thereon but only grants an easement therein, and a subsequent conveyance of a lot bordering upon a street so marked passes title to the center of the street.

5. RIPARIAN RIGHTS—*grants of land bordering on river carry title to center of stream.* Grants of land bordering upon a river carry the exclusive right and title of grantee to the center of the stream, unless the terms of the grant clearly denote an intention to stop at the water's edge.

6. SAME—*effect where street as platted is bounded by a river.* Where one boundary of a street is denoted on the plat by an irregular, wavy line, depending upon the meanderings of a river and indicating the river as the boundary, the width of the street increases as accretions gradually form on the river bank indicated as the boundary. (*City of Brooklyn* v. *Smith*, 104 Ill. 429, followed; *Sanitary District of Chicago* v. *Adam*, 179 id. 406, explained.)

7. INJUNCTION—*owners of fee in street may enjoin imposition of additional servitude.* The owners of the fee in a street may enjoin the imposition of an additional servitude thereon until a grant has been obtained from them or their interest condemned and paid for.

8. ESTOPPEL—*what will not estop owner of fee in street from enjoining imposition of an additional servitude.* That the owners of the fee in a street have allowed railroad companies to enter thereon without objection does not estop them from enjoining the construction of a steam railroad thereon by another company.

WRIT OF ERROR to the Circuit Court of Rock Island county; the Hon. W. H. GEST, Judge, presiding.

JOSEPH L. HAAS, and SWEENEY & WALKER, for plaintiffs in error.

J. T. KENWORTHY, for defendants in error.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The defendants in error, Walter Johnson and Frederick Hass, filed separate bills in equity in the circuit court of Rock Island county against plaintiffs in error, alleging that complainants were owners of lots fronting on Mississippi street, (now called First avenue,) in the city of Rock Island, lying between their lots and the Mississippi river on the north; that they were the owners in fee of so much of said street as was situated immediately north of their respective lots to the center thereof, subject only to an easement in the public for the purposes of a street; that the defendants were about to build and maintain a railroad embankment, with railroad tracks, in said street in front of their premises where they were so vested with the fee, without having obtained, by condemnation or otherwise, any right to appropriate said lands for railroad purposes. The bills were answered with denials of the rights claimed, and the issues were referred to the master in chancery. In each case a stipulation as to the facts was made and

testimony was also taken, and the reports of the master were in favor of complainants. Exceptions were taken by the defendants, which were overruled by the court, and there were decrees for perpetual injunctions against constructing, maintaining or using any railroad track or tracks on the street in front of complainants' property unless defendants should obtain the right to do so by grant or condemnation. The cases have been consolidated.

The question to be decided is whether the complainants, as owners of lots fronting on Mississippi street, (now First avenue,) are the owners of the fee where it is proposed to locate and build the railroad tracks, subject to a public easement in the city of Rock Island for the purposes of a street, or whether the fee in the street is in the city of Rock Island, which has granted the right to so locate and build said railroad tracks. If the complainants are the owners of the fee they are entitled to enjoin the defendants from appropriating the street and imposing an additional servitude upon their lands until a grant has been obtained from them or their interest has been condemned and paid for. (*Bond* v. *Pennsylvania Co.* 171 Ill. 508.) The facts upon which that question turns are as follows:

On March 1, 1833, an act of the General Assembly was passed appointing John Dixon and Elijah Charles of JoDaviess county and John B. Gum of Knox county, commissioners to locate a permanent seat of justice for Rock Island county, to be called Stephenson, in commemoration of Col. Benjamin Stephenson. (Laws of 1833, p. 17.) It appears that these commissioners did not make the location, and another act was passed, in force February 12, 1835, by which William Bennett of JoDaviess county, Peter Butler of Warren county and John G. Sanburn of Knox county were appointed commissioners to locate such permanent seat of justice for Rock Island county, and the county seat, when selected and located, was to be called Stephenson. By section 3 it was pro-

vided that when said commissioners, or a majority of them, should have agreed upon the place, they should make a report to the county commissioners, and the commissioners, at their next term, should cause the same to be entered upon the records of said court and the place so selected should be the permanent seat of justice. If the location was on public land, the county commissioners were authorized to proceed to purchase it for the use of the county. (Laws of 1835, p. 159.) The commissioners so appointed located the seat of justice for said county on public land on the north-west fractional quarter of section 35, in township 18, north, range 2, west of the fourth principal meridian, and on July 8, 1835 made report thereof to the county commissioners, who entered and purchased said tract of land from the United States. A patent was afterward issued, dated May 20, 1841, reciting payment by George Davenport, John W. Spencer and John Vanata, county commissioners of Rock Island county, and conveying said tract to said county. The tract contained 61.95 acres according to government survey, and its northern boundary was the Mississippi river. The land conveyed to the county of Rock Island therefore extended to the center thread of said river. The county commissioners, under authority of "An act providing for the recording of town plats," in force February 27, 1833, laid out said town of Stephenson on said tract of land, and on July 10, 1835, the county surveyor presented a map or plat of said town to the county commissioners court, properly certified, as required by the fourth section of said act, and the map was also certified by the county commissioners. On the same day the surveyor and county commissioners also acknowledged the plat before Joseph Conway, clerk of the circuit court for Rock Island county. The acknowledgment was not before a justice of the Supreme Court, a justice of the circuit court or a justice of the peace of said county, (the officers named in the act and authorized to take the acknowl-

edgment,) and therefore such acknowledgment was insufficient. (*Village of Vermont* v. *Miller*, 161 Ill. 210.) If it was necessary to acknowledge the plat it could not operate as a statutory dedication, but would only grant an easement instead of a fee in any of the streets marked upon it. The plat showed a street marked "Mississippi street," on the north of the town, extending along the north tier of blocks and next to the Mississippi river, with four wavy, parallel lines on the north indicating the river, and with the name "Mississippi River" written there. The certificate stated with reference to streets as follows: "Each street 80 feet, except Water or Front street at the north-east end of town is 110 feet wide, at or near the middle of the town or widest part of street 260 feet, at the south-west end of the town 90 feet wide." This street, called Water or Front street, is the one also called Mississippi street, and is now First avenue. Complainants' lots front on the south side of that street, and on the opposite side is the Mississippi river. In the stipulated facts it was agreed that if, in law, the center of the Mississippi river is the north line of Mississippi street or First avenue, the proposed construction of defendants' railroad is on the south half of said street.

The question of law whether the fee in the street has passed from the county of Rock Island to the city of Rock Island, of which the town of Stephenson is a part, depends upon whether the plat of the town was made in accordance with the act of 1833. Under that act the plat would operate as a conveyance if made in compliance with its terms, but it would so operate only in case all the conditions of the act were complied with. Section 5 of the act provided as follows: "The plat or map, when made out and certified, acknowledged and recorded, as required by this act, every donation or grant to the public, or any individual or individuals, religious society or societies, or to any corporation or bodies politic, marked or noted as such on said plat or map, shall be deemed in

law and in equity a sufficient conveyance to vest the fee simple of all such parcel or parcels of land as are therein expressed, and shall be considered to all intents and purposes as a general warranty against such donor or donors, their heirs and representatives to the said donee or donees, grantee or grantees, for his, her, or their use, for the uses and purposes therein named, expressed or intended, and no other use or purpose whatever. And the land intended to be for streets, alleys, ways, commons, or other public uses, in any town or city, or addition thereto, shall be held in the corporate name thereof, in trust to, and for the uses and purposes set forth, and expressed or intended." If there was a failure to observe the requirements of the statute and the plat operated as a common law dedication, a conveyance of complainants' lots bounded by the street would operate as a conveyance of the fee to the center of such boundary. In such case they would own to the center of the street burdened with the easement. Whether it was a statutory or common law dedication, the dedication was accepted and the city council passed an ordinance granting to the defendants the right to construct, maintain and use their tracks which complainants asked to have enjoined.

It will be noted that section 5, which provides that the plat shall operate as a conveyance of the fee in the street to the public, includes the acknowledgment of the plat as required by the act as one of the conditions to such operation. The first three sections require county commissioners who wish to lay out a town to cause the same to be surveyed and a plat or map thereof made, with lots numbered, corner stones planted and in other respects as required by those sections, and then section 4 provides as follows: "The plat or map, after having been completed, shall be certified by the surveyor and the county commissioners, and every person or persons whose duty it may be to comply with the foregoing requisitions, shall, at or before the time of offering such plat or map

for record, acknowledge the same before a justice of the Supreme Court, justice of a circuit court, or a justice of the peace in the county where the land lies, a certificate of such acknowledgment shall be by the officer taking the same endorsed on the plat or map; which certificate of the survey and acknowledgment shall also be recorded and form a part of the record." The county commissioners are persons whose duty it is made, in the plainest and most unmistakable terms, to comply with the requisitions going before in the previous sections, and they are therefore required by section 4 to acknowledge the plat. In this case the commissioners understood that they were bound to acknowledge the plat, as appears from their doing so; but instead of doing it before one of the judicial officers named in the act, they made their acknowledgment before the clerk of the circuit court, who was not authorized to take it. In *Town of Lake View* v. *LeBahn*, 120 Ill. 92, a plat had been made by private owners, and it was claimed that the county commissioners were required to certify to it. The court, passing on that question, said (p. 99): "We do not understand the statute to so require. It provides for the case of laying out towns or subdivisions by county commissioners or other persons; and as we read the statute, where county commissioners cause the plat to be made they are to acknowledge it, and where other persons cause the plat to be made they only are required to acknowledge it, and that the plat need only to be certified by the county surveyor."

The further provisions of the act of 1833 show that the legislature understood that county commissioners must acknowledge the plat. Section 7 provided as follows: "Where any town, addition, or subdivision of out-lots has been heretofore laid out, and lots sold in this State, either by county agents, commissioners, or other persons, and a plat or map of the same has not been acknowledged and recorded as required by the act, entitled 'An act to provide for the recording of town plats,' approved Janu-

ary 4, 1825, and the amendment to said act, passed at a subsequent session, it shall be the duty, and it is hereby required of the present county commissioners, or a majority of them, in such county, or other person or persons, proprietors, who have laid out the same, or his, her, or their legal representatives, to have the same fairly, fully, and clearly made out, certified, acknowledged, and recorded in the proper county, in the form and manner required by this act, * * * and if any county commissioner or commissioners, or other person or persons, whose duty it is to comply with the requisitions in this section named, shall neglect or refuse so to do, he or they shall forfeit and pay the sum of $100 for each and every month he or they shall delay a compliance." This provision required the then existing county commissioners, or a majority of them, to have such a plat acknowledged as required by the act, where it had not already been done.   This provision was re-enacted as section 23, division 1, chapter 25, of the Revised Statutes of 1845, and applied to towns laid out under this act of 1833.   This regulation establishes the legislative understanding that an acknowledgment was required.   Severe penalties were imposed upon any county commissioner or commissioners who should delay or refuse to comply with the requisitions of that section.

It is contended, however, in argument, that the county commissioners were not meant by the act of 1833 because they constituted a court, and it could not have been intended that a court should acknowledge its acts.   It will be seen that the acknowledgment of the plat was required to be by the persons who were county commissioners, and that the penalties imposed for a failure of duty were against the individuals.   In the curative provision of section 7 and the subsequent revision of 1845, the county commissioners, or a majority of them, were required to acknowledge the plat, and section 8 of the act of 1833 imposed a penalty of $100 against any county commis-

sioner who caused a town to be platted in any other man-
ner than that which was prescribed in the act. It would,
of course, be preposterous to suppose that a court, with
its clerk and sheriff, should adjourn to the office of a jus-
tice of the peace or other judicial officer named in the act
and hold a special session there for the purpose of ac-
knowledging a plat as a judicial act of the court. But
the act is not of that nature. Section 4 of the schedule
to the constitution of 1818 provided: "There shall be
elected, in each county, three county commissioners for
the purpose of transacting all county business, whose
time of service, power and duties shall be regulated and
defined by law." These officers were named county com-
missioners, and they were elected to attend to business
affairs. By the statutes they were organized into a court,
but their duties were ministerial and administrative as
well as judicial. In *County of Vermilion* v. *Knight*, 1 Scam.
97, the court said (p. 100): "The constitution, indeed, ex-
pressly names them commissioners, and through all the
legislative acts, when spoken of, the term 'county com-
missioner' is used as frequently as 'county commissioners
court.' They are known by the law as a public corpo-
ration, created for the purpose of superintending the
business of the county in relation to its fiscal and local
concerns." The law authorized them to enter into con-
tracts for the county and to manage its business affairs,
and the act in question here was ministerial and admin-
istrative in its nature and not in any sense judicial. It
was a duty imposed upon the commissioners, and for a
failure to observe it each individual was to be visited
with a penalty.

It is also argued that the county commissioners were
not required to acknowledge the plat, under the rule, in
cases where the canal commissioners platted lands be-
longing to the State. The rule in such cases was deter-
mined in *City of Chicago* v. *Rumsey*, 87 Ill. 348, and it was
held that the act for the construction of the Illinois and

Michigan canal, which made it the duty of the commissioners to lay out town sites into town lots, did not require an acknowledgment. The plat made in that case was in conformity with all the provisions of the statute governing the canal commissioners in disposing of the lands of the State, but it was said that if the land had belonged to any other party than the State, the point that there was no acknowledgment would have been well taken; that the statute of 1833 included almost every other authority or person but the State by which a town could be laid out, but that it did not include the sovereign. In *Matthiessen & Hegeler Zinc Co.* v. *City of LaSalle*, 117 Ill. 411, the same rule was stated and another line of reasoning was pursued to the same conclusion. It was said that when the statute providing for laying out towns by the canal commissioners was passed, the statute of 1833, which did not name the State, was in force; that the act concerning the canal empowered the commissioners to lay out town sites, and that the law also provided that all deeds, title papers, agreements and contracts of the canal commissioners affecting title of real estate should be admitted to record without proof or acknowledgment of the execution thereof. These cases were decided upon the ground that the act of 1833 did not include the State as the sovereign, and that it had provided in another act for laying out towns on its land.

The acknowledgment of the plat not being in conformity with the requirements of the statute, the fee to the street has not vested in the city of Rock Island, but the north half is in the county of Rock Island and the south half in the abutting lot owners.

The next question is, where the center line of the street is located to which complainants' ownership extends. The title of the county of Rock Island to the tract on which the town was laid out extended to the center of the Mississippi river, but defendants insist that the street extends only to the south side of the river. The

188—31

same question arose in *City of Brooklyn* v. *Smith*, 104 Ill. 429. The appellee, Smith, filed his bill for an injunction against the village of Brooklyn to prevent interference with his cutting and gathering a crop of ice in the Mississippi river west of Water street of said village. The village was laid out on the east bank of said river, and Water street ran parallel with the river and extended to the water's edge. The plat of the village had the force of an express grant to convey the fee to the village. Water street was designated on the plat as eighty feet wide, but extensive accretions formed on the river front, comprising an area of one hundred acres or more. The question to be decided was how far Water street extended westward, and the court sustained the claim of the village that the street extended to the middle of the river. On the plat the western line of Water street along the river was an irregular, wavy line, the same as in this case, depending on the meanderings of the river and indicating the river as a boundary. The court said (p. 438): "Grants of land bounded on rivers or upon their margins, above tide water, carry the exclusive right and title of the grantee to the center of the stream, unless the terms of the grant clearly denote the intention to stop at the edge of the river. (*Braxon* v. *Bressler*, 64 Ill. 488, and authorities there cited.) The premises in question, then, were in Water street, of the village of Brooklyn." It was held that the case presented was that of an intruder upon the public street of a village cutting and removing ice from the street. The court said that the stream was a public highway and in contact with it the other easement of a street. Under that decision there is no question but this street extended to the center of the Mississippi river.

It is, however, urged with the utmost confidence that the decision in that case was overruled in *Sanitary District of Chicago* v. *Adam*, 179 Ill. 406. We do not understand it in that way. In the later case the appellees owned lots 1 and 2 in block 57, on the east bank of the DesPlaines

river, and had title to the center of the stream. On the west side of said river, opposite the said lots, they also owned lots 1 and 4 in block 56. School street bordered on the river on the west bank, between block 56 and the river. It was contended that as appellees owned lots in block 57 on the east side, extending to the center of the river, and School street extended eastward to said center of the river, the lots on the east side abutted on the east side of School street, in the middle of the river. It was said that the argument was more fanciful than real; that under the doctrine laid down in *City of Brooklyn* v. *Smith, supra,* the street extended to the center of the river, but that the expression "adjoining lot owners" applied only to owners of lots abutting on a street to which they could have access from their lots, and did not refer to lots on the opposite side of the river. The decision recognizes the doctrine that the street in this case extends to the center of the river, and the point decided there was, that one owning a lot on the opposite shore was not an abutting lot owner, where there was an insuperable obstacle to his access to the street from his lot.

It is contended that complainants are estopped by their conduct to claim any rights in the street against defendants. They stood by and permitted other railroads to trespass on their rights, but we find nothing in their conduct that could operate as an estoppel as to the defendants. When the defendants undertook to enter upon the premises in front of complainants' lots the latter obtained injunctions. The fact that other companies had entered upon and occupied the land and complainants did not object furnishes no ground for claiming that they abandoned the constitutional guaranties as against defendants. When a new servitude is threatened by a new party, we see no reason why they may not object until compensation is made or why they should be barred from seeking the protection of the court.

The decrees are affirmed.                    *Decrees affirmed.*